UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVSIION

TODD LOGAN,                                )    CASE NO. 1:17-cv-1905
                                           )
        Plaintiff,                         )
                                           )
                                           )    MAGISTRATE JUDGE
        v.                                 )    THOMAS M. PARKER
                                           )
COMMISSIONER OF                            )    **MEMORANDUM OF OPINION**
SOCIAL SECURITY,                           )    **AND ORDER**
                                           )
        Defendant.                         )
                                           )

## I.      Introduction

Plaintiff, Todd Logan, seeks judicial review of the final decision of the Commissioner of

Social Security denying his application for disability insurance benefits under Title II of the

Social Security Act ("Act").  The parties consented to my jurisdiction.  ECF Doc. 16.

Because the ALJ supported her decision with substantial evidence and because Logan has

not identified any incorrect application of legal standards, the final decision of the Commissioner

must be AFFIRMED.

## II.     Procedural History

Logan applied for disability insurance benefits on January 24, 2014.  (Tr. 85, 229-237)

After his claims were denied initially (Tr. 153-179) and on reconsideration (Tr. 183-194), Logan

requested a hearing.  (Tr. 192)  Administrative Law Judge ("ALJ") Penny Loucas heard the case

on November 4, 2015 (Tr. 108-152), and found Logan not disabled in a March 29, 2016

decision.  (Tr. 82-95)  Logan requested review of the ALJ's decision on May 23, 2016 (Tr. 226-

228), but the Appeals Council denied review on July 13, 2017, rendering the ALJ's decision final.  (Tr. 1-7)  Logan instituted this action to challenge the Commissioner's final decision.

## III.     Evidence

### A.     Personal, Educational and Vocational Evidence

Logan was born on March 22, 1968 and was 43 years old on the date last insured.  (Tr. 231)  He has his GED and previously worked as a welder.  (Tr. 110, 118)

### B.     Relevant Medical Evidence

Logan injured his lower back at work in 1998 but continued to work for several more years.  (Tr. 879)  He was initially diagnosed with lumbar sprain/strain.  He was incarcerated in 2008 and 2009.  (Tr. 837-906)  In February 2008, he underwent a mental status examination, the results of which were normal.  (Tr. 842)  He was not using any medications.  Based on the normal mental examination, no psychological services were recommended.  (Tr. 837-855)

While in prison, Logan received treatment for his back pain.  He was given Flexeril, Motrin, and cortisone shots.  Physical examination showed full movement; stiff posture; slow, steady gait; and full range of motion.  (Tr. 877, 879)  He had no activity restrictions.  (Tr. 878, 880)  X-rays taken on March 7, 2008 showed normal lumbar bodies and disc spaces, no spondylolytic defect, and no advanced degenerative disease.  The impression was mild dextroscoliosis.  (Tr. 883)

An MRI on August 11, 2009 showed disc protrusion at L4-5 to the right with moderate to severe canal stenosis and mild foraminal narrowing at L4-5.  (Tr. 303)  Logan underwent an L4-5 interbody fusion, L4-5 discectomy, L4-5 osteotomies, L4-5 arthrodesis and bone graft on November 6, 2009.  (Tr. 383)  Logan claims his disability began on the day he had back surgery, November 6, 2009.  (Tr. 231)

On November 17, 2009, Logan followed- up with occupational medical specialist, Paul Hanahan, M.D., two weeks after his surgery.  Logan reported that radiating pain to his right leg had resolved.  Examination showed muscle tenderness in the lower back.  Dr. Hanahan prescribed Vicodin and ibuprofen.  (Tr. 301)  X-rays on November 23, 2009, showed status post spinal fusion with anatomic alignment.  (Tr. 408)

Logan followed up with Dr. Hanahan on December 15, 2009.  Logan reported much improvement; his right leg pain was no longer present.  Logan had been given a physical therapy allowance through workers' compensation but had not yet begun therapy.  Examination showed limited range of motion, mild tenderness to the paralumbar muscles, and improving gait.  Dr. Hanahan continued prescriptions for Vicodin and ibuprofen and added Flexeril.  (Tr. 301)

X-rays on December 21, 2009 showed status-post spinal fusion at L4-L5, intact metallic hardware, normal spinal alignment with no acute compression or spondylolisthesis.  (Tr. 407) X-rays on February 1, 2010 were the same.  (Tr. 406)

On February 2, 2010, Logan saw Dr. Hanahan who noted that he had been cleared by the neurosurgeon to return to work.  Logan was cautious about his ability to do his construction job. Dr. Hanahan noted that Logan had not participated in physical therapy.  Examination showed slight tenderness at the extremes of range of motion; leg lift was strong bilaterally; and gait was normal.  Dr. Hanahan prescribed Vicodin.  (Tr. 297)

Logan saw Dr. Hanahan again on March 15, 2010.  He reported back pain but denied that any activity caused the pain.  Logan had returned to work but had been allowed to do less physical work.  Logan reported doing well until March 13, 2010.  Examination showed restricted range of motion due to pain; no muscle spasm; neurological exam was grossly intact; and he had antalgic gait favoring the right side.  Dr. Hanahan ordered physical therapy and prescribed Vicodin and Flexeril.  (Tr. 297)

X-rays on June 16, 2010 were unremarkable without significant change from previous studies. (Tr. 405)

Logan returned to Dr. Hanahan on June 21, 2010. He reported going to the emergency room the prior week; he had pain in his lower back after lifting his grandchild. Following neurosurgical evaluation, physical therapy was scheduled. Logan intended to begin therapy the next day. Examination showed limited range of motion, leg raise weakness on both sides, radiating pain into the left leg, and numbness into the left foot. Dr. Hanahan diagnosed an acute strain, encouraged physical therapy and prescribed Roxicodone. (Tr. 296)

From June 22, 2010 to September 3, 2010, Logan attended 23 out of 27 physical therapy visits. (Tr. 431-454) Logan reported activities like repairing his car and mowing the lawn. (Tr. 445, 449) Toward the end of physical therapy, the therapist noted that "pace of recovery has picked up considerably." (Tr. 433) On September 1, 2010, Logan reported improvement with no back pain and 0/10 symptom rating. (Tr. 432) At his last appointment on September 3, 2010 he reported no back pain but some ache; good response to treatment; and a symptom rating of 0/10. (Tr. 432)

On July 19, 2010, Logan reported improvement with physical therapy to Dr. Hanahan. He was noting slightly less pain and feeling stronger. He was taking a minimal amount of medication. Examination showed tenderness in the right paralumbar area; muscles were tighter on right than the left; he had restricted range of motion on the right side; dorsi and plantar flexion weakness in the feet, right greater than left; and reduced deep tendon reflexes in the right ankle. Dr. Hanahan recommended continued physical therapy and prescribed Roxicodone. (Tr. 295)

He met with Dr. Hanahan again on August 17, 2010. Logan reported that he had not been consistent with physical therapy due to personal obligations. He was unsure of whether he could return to his previous jobs. They discussed a work conditioning program. Examination

showed fair to good range of motion in back; there were no muscle spasms; he had weakness in his right leg; he had normal dorsi and plantar flexion. Dr. Hanahan ordered that Logan return to physical therapy and start a work hardening/conditioning program in September 2010. He also filled Logan's Roxicodone prescription. (Tr. 295)

On September 7, 2010, Logan met with Donald Weinstein, Ph.D., for a psychological consultation for his worker's compensation claim. (Tr. 580-583) Dr. Weinstein concluded that Logan met the criteria for a formal diagnosis of major depressive disorder, single episode, moderate. Dr. Weinstein opined that Logan was temporarily and totally disabled and needed vocational rehabilitation. (Tr. 583)

Logan saw Dr. Hanahan on September 14, 2010. Examination showed Logan's range of motion was restricted to the right and leg lift was weaker on the right. Dr. Hanahan refilled Logan's prescription for Roxicodone. (Tr. 294)

On October 13, 2010, Logan returned to Dr. Hanahan. Examination showed that his range of motion was fair to good with tenderness at the extremes; his leg lift was relatively weak on both sides, more so on the right; his gait was mildly antalgic, favoring the right; and he had mild tenderness at the lower midline. Dr. Hanahan ordered that he begin work conditioning and refilled the prescription for Roxicodone. (Tr. 293)

On November 11, 2011, Dr. Hanahan's notes reflect that he withdrew Logan from work conditioning after a psychologist suggested Logan was not mentally ready to return to his former position. Logan reported problems with his right leg. Dr. Hanahan referred him to physical therapy and refilled his prescription. (Tr. 293)

Logan returned to Dr. Hanahan on December 10, 2010 reporting that he was seeing a psychologist every two weeks for major depressive disorder.[1] Logan also reported lower back

---

[1] The administrative record contains no evidence of such visits.

pain with radiation to the left hip. Examination showed moderate tenderness in the lower midline; range of motion was restricted to the left; and gait was antalgic, favoring the left. Dr. Hanahan refilled Logan's prescription and noted that he would reconsider vocational rehabilitation after Logan was cleared by psychiatry. (Tr. 292)

Logan met with Dr. Hanahan on January 5, 2011. He reported that his former employer said he could return to his old job if given clearance. Dr. Hanahan observed that Logan's gait was severely antalgic; he was walking hunched over. Logan admitted to smoking marijuana. Dr. Hanahan ordered a drug screen to be performed that day. (Tr. 292) He discharged Logan from his care on January 11, 2011, after a failed drug screen showed positive results for marijuana and hydrocodone and negative results for oxycodone, the prescribed pain medication. (Tr. 291)

Logan saw orthopedic surgeon, Tim Nice, M.D., on January 18, 2011. Logan reported a history of spinal fusion surgery in 2009 and pelvic/hip pain. Examination revealed good strength in his hips. Neurological examination was normal in his legs. X-rays of the pelvis and hips were normal. Dr. Nice recommended a bone scan to investigate Logan's "uncharacteristic pain" and, if negative, planned to bring him back in for an injection. (Tr. 306)

On March 18, 2011, Logan saw Satish Mahna, M.D., for aching discomfort in the lower back without radiation into the groin and legs. He was taking Valium and Excedrin. (Tr. 312) Examination showed that he was walking unassisted with a right antalgic gait. He had tenderness and restricted range of motion in the lower lumbar area; some restricted range of motion in the right hip; weakness in the right hip flexors; equivocal straight leg raise tests; and questionable atrophy of the right quadriceps. (Tr. 313) Dr. Mahna recommended diagnostic imaging and that he continue his current medications. (Tr. 314)

On April 1 and 15, 2011, Logan returned to Dr. Mahna reporting worsening pain and weakness in his right leg. (Tr. 315) Examination findings were the same. (Tr. 316, 319) Logan reported using a cane because his left hip began hurting after favoring the right side. (Tr. 318) Dr. Mahna prescribed Vicodin and Motrin and ordered an MRI. (Tr. 317, 319)

On April 29, 2011, Logan returned to Dr. Mahna. (Tr. 320) He reported that his hips continued to hurt. He ambulated into the examination room unassisted with a right antalgic gait. Examination findings were unchanged. (Tr. 320-321) Dr. Mahna recommended that Logan seek other care for MRI findings related to his sacral area because it was not covered by worker's compensation. He prescribed Vicodin. (Tr. 322)

On May 27, 2011, Logan followed-up with Dr. Mahna. Logan complained of low back pain with radiation to the right lower extremity and pain in both hips. Examination findings were unchanged except for additional weakness of the right quadriceps and right foot dorsiflexors. (Tr. 323-324)

Logan saw Dr. Mahna twice in July 2011. (Tr. 325-330) Examination findings were similar but he also had positive straight leg raise on the right and equivocal on the left. Dr. Mahna recommended a bone scan. (Tr. 327, 329-330) The bone scan revealed mild degenerative changes in the spine, shoulders, knees and hips. (Tr. 332-333, 543)

Logan met with Dr. Mahna on October 14, 2011. (Tr. 331-333) He continued to complain of low back pain with radiation into the right lower extremity and pain in his hips. Logan had returned to work on September 18, 2011 and was working 20-30 hours a week. (Tr. 333) Logan walked unassisted with a right antalgic gait. (Tr. 331) He had tenderness and restricted range of motion in the lower lumbar area; some restricted range of motion in the right hip; weakness in the right hip flexors, right leg quadriceps, and right foot dorsiflexors; and positive straight leg raise test on the right, equivocal on the left. (Tr. 332) A bone scan on July

27, 2011 did not show any increased activity in the sacrum area. (Tr. 333) Dr. Mahna prescribed Motrin and Vicodin. (Tr. 332)

On November 4, 2011, Logan reported that his pain had grown worse since returning to work. (Tr. 334) Logan continued to work 30 hours a week. (Tr. 336) Examination findings were unchanged. (Tr. 335) Dr. Mahna recommended a TENS unit. (Tr. 336) On November 16, 2011, x-rays of the lumbar spine were unremarkable except for post-operative changes of the lower spine with intact hardware. (Tr. 309)

Logan met with Dr. Mahna again on December 30, 2011. Logan continued to complain of back pain. Examination findings were unchanged. (Tr. 340) Dr. Mahna referred Logan to Jeffrey Shall, M.D., for other treatment and/or surgical options. (Tr. 342)

The following medical evidence post-dates Logan's date last insured, December 31, 2011. Logan saw Dr. Shall on January 19, 2012. He was using a cane and ambulating "terribly." He was sitting in a leaning position on his left buttock. He had stopped working due to pain and Dr. Shall stated that, based on the way Logan was sitting and walking, he did not feel that he would be able to work. Physical examination showed trace reflexes at the knees, absent at the ankles. Straight leg raising caused low back discomfort. Motor and sensory were grossly intact. Dr. Shall recommended an EMG, a CAT scan, another MRI, and prescribed Mobic and Neurontin. (Tr. 462-463)

On January 20, 2012, Logan reported to Dr. Mahna that he had seen Dr. Shall, who recommended additional diagnostic imaging. (Tr. 343) The examination findings were unchanged. (Tr. 343-344) Dr. Mahna refilled Logan's Vicodin prescription. (Tr. 344)

On February 10, 2012, Logan reported to Dr. Mahna that he had not returned to Dr. Shall since his last visit. He reported improvement with Mobic and Neurontin. (Tr. 345) The

examination findings were unchanged and Dr. Mahna refilled his prescription for Vicodin. (Tr. 346)

On March 12, 2012, a CT scan showed moderate canal stenosis at the L3-4 level related to degeneration and annular bulging; and a history of laminectomy at L4 with disk cages present at L4-L5 and posterior fusion with pedicle screws at L4 and L5 without recurrent canal stenosis. (Tr. 363-366)

On April 5, 2012, Logan returned to Dr. Shall and reported that he was doing somewhat better with Neurontin and Mobic. Dr. Shall recommended an external bone stimulator because it appeared from testing that the lack of boney fusion was contributing to his pain. He also recommended an epidural steroid injection and that Logan increase his Neurontin dosage. (Tr. 464)

On July 2, 2012, Dr. Shall noted excellent results from a June 7, 2012 nerve block. Logan wanted a permanent solution and discussed surgery. Logan promised to stop smoking for a year before and after surgery. (Tr. 465)

Logan underwent surgery on July 31, 2012. Logan was found to be doing pretty well ten days after surgery. He was still smoking "a little" and Dr. Shall admonished him for that. Logan was fit for his stimulator and continued to wear a brace. (Tr. 466)

### C. Opinion Evidence

#### 1. Reviewing Physicians

On March 19, 2014, state agency reviewing physician, Maureen Gallagher, D.O., found Logan could perform a range of light work. She determined that he could occasionally lift 20 pounds; could frequently lift 10 pounds; could stand, walk, or sit for a total of 6 hours in an eight hour workday; could never climb ladders, ropes or scaffolds; could occasionally climb ramps or

stairs, balance, stoop and crawl; could frequently crouch; and was unlimited in his ability to push or pull, and kneel. (Tr. 158-159)

On August 1, 2014, Diane Manos, M.D., reviewed Logan's records and agreed with the opinions expressed by Dr. Gallagher.  (Tr. 172-173)

### 2.      Reviewing Psychologists

On March 18, 2014, Paul Tangeman, Ph.D., reviewed Logan's records and determined that Logan had a severe affective disorder but that there was insufficient evidence to assess whether Logan had a disability before the date last insured.  (Tr. 156-158)  The record contained an opinion from Stacey Foerstner, Ph.D., but it was submitted long after the date Logan was last insured.  (Tr. 160)  On August 9, 2014, Karla Voyten, Ph.D., reviewed Logan's records and agreed that there was insufficient evidence to assess Logan's psychological condition.  (Tr. 170-172)

### D.      Testimonial Evidence

### 1.      Logan's Testimony

Logan testified that he worked as a welder and a truck driver.  (Tr.  118 -122)  Logan's back pain started in 1998 when he was injured at work.  (Tr. 141)  Around 2007 to 2008, Logan was incarcerated and had severe back pain and difficulty walking.  (Tr. 125)  He declined treatment while in prison because he did not trust the doctors there.  (Tr. 125)

Logan underwent back surgery in 2009.  (Tr. 125-126)  He returned to work after his surgery even though his doctors told him he would never work again.  (Tr. 126)  However, he was injured after working a couple of days and realized that he might not be able to work again.  (Tr. 126)  Surgery and physical therapy worsened his back pain.  (Tr. 141)

Logan said he received weekly mental health care at Weinstein & Associates since 2010. He attended counseling and yelled and "let out his anger." (Tr. 140) He isolated himself and was angry that he couldn't work. (Tr. 141)

Logan did not go upstairs anymore. He could do simple chores around the house such as dishes, cooking and laundry. He could walk around his yard. He and his mother-in-law helped one another while his girlfriend was at work. (Tr. 143-144)

<h3 align="center">2. Vocational Expert Testimony</h3>

Vocational Expert Gail Klier testified that an individual with plaintiff's age, education, work history and RFC could perform the occupations of order caller, ticket seller, and parking-lot attendant. (Tr. 146-148) Because Logan's arguments do not relate to the VE's testimony, a more thorough summary of the VE's testimony is unnecessary.

## IV. The ALJ's Decision

The relevant portions of ALJ's decision (Tr. 82-95) can be paraphrased as follows:[2]

1. Logan last met the insured status requirements of the Social Security Act on December 31, 2011. (Tr. 87)

3. Through the date last insured, Logan had the following severe impairments: degenerative disc disease of the lumbar spine, status post L4-5 interbody fusion surgery in 2009. (Tr. 87)

5. Logan had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except he could never climb any ladders, ropes or scaffolds, could occasionally climb ramps and stairs, could occasionally stoop, balance and crawl, could frequently crouch and was unlimited in his ability to kneel. (Tr. 89-93)

6. Logan was unable to perform any past relevant work. (Tr. 93)

10. Considering Logan's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that he could perform. (Tr. 93)

---

[2] The court includes only those findings relevant to the issue Logan has raised.

Based on her twelve findings, the ALJ determined that Logan had not been under a disability from November 6, 2009, the alleged onset date, through December 31, 2011, the date last insured. (Tr. 94)

## V. Law & Analysis

### A. Standard of Review

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003); *Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §§ 405(g) and 1383(c)(3). The findings of the Commissioner may not be reversed just because the record contains substantial evidence to support a different conclusion. *Buxton v. Halter,* 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen,* 800 F.2d 535,545 (6th Cir. 1986); *see also Her v. Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached." *See Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997). This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without risking being second-guessed by a court. *Mullen,* 800 F.2d at 545 (*citing Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984).

The court also must determine whether the ALJ decided the case using the correct legal standards. If not, reversal is required unless the legal error was harmless. *See e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010). Requiring an accurate and logical bridge ensures that a claimant will understand the ALJ's reasoning.

In considering an application for supplemental security income or for disability benefits, the Social Security Agency is guided by the following sequential benefits analysis: at Step One, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step Two, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step Three, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step Four, the Commissioner determines whether or not the claimant can still perform his past relevant work;

and finally, at Step Five, if it is established that claimant can no longer perform his past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national economy. *See Combs v. Comm'r of Soc. Sec.,* 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920.  A plaintiff bears the ultimate burden to prove by sufficient evidence that he is entitled to disability benefits.  20 C.F.R. §404.1512(a).

### B.    Treating Physician Rule[3]

Logan argues that the ALJ failed to properly apply the treating physician rule.  The analysis section of Logan's brief does not state the name of any of his treating physicians and only vaguely explains how the ALJ erred in rejecting their opinions.  However, earlier in the medical history portion of his brief, Logan appears to argue that the ALJ improperly discounted the opinion of Dr. Weinstein.  He complains that the ALJ assigned little weight to the state agency psychological reviewers.  And, he contends that the ALJ erred in giving no weight to the opinions of psychological experts Dr. Foerstner, Dr. Chatterjee, and Dr. Koricke, who formed their opinions long after Logan's last insured date.  ECF Doc. 12 at Ex. 46, Page ID# 971.  The treating physician rule requires that "[a]n ALJ [] give the opinion of a treating source controlling weight if she finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in [the] case record."  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(c)(2)) (internal quotation marks omitted).

Even if the ALJ does not give the opinion controlling weight, the opinion is still entitled to significant deference or weight which takes into account the length and frequency of the

---

[3] The regulations for handling treating source evidence have been revised for claims filed after March 27, 2017.  *See* 20 C.F.R. § 416.927.  Logan filed his claim before the revision took effect.

treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and whether the treating physician is a specialist. 20 C.F.R. § 416.927(c)(2)(6). The ALJ is not required to explain how she considered each of these factors but must provide "good reasons" for discounting a treating physician's opinion. 20 C.F.R. § 416.927(c)(2); see also *Cole v. Astrue*, 661 F.3d 931, 938 (6th Cir. 2011) ( ("In addition to balancing the factors to determine what weight to give a treating source opinion [when controlling weight has been denied,] the agency specifically requires the ALJ to give good reasons for the weight actually assigned."). "These reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, *12, 1996 WL 374188, at *5 (July 2, 1996)) (internal quotation marks omitted).

A failure to follow these procedural requirements "denotes a lack of substantial evidence, even whe[n] the conclusion of the ALJ may be justified based on the record." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 243 (6th Cir. 2007). The Sixth Circuit Court of Appeals "do[es] not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and [it] will continue remanding when [it] encounter[s] opinions from ALJs that do not comprehensively set forth reasons for the weight assigned." *Cole*, 661 F.3d at 939 (quoting *Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009)) (alteration in original) (internal quotation marks omitted).

ALJ Loucas discussed Dr. Weinstein's opinion as follows:

Little weight is also given to the opinion of Dr. Weinstein dated September 7, 2010 because he relied heavily on the claimant's self-report. Moreover, he concluded that the claimant was temporarily and totally disabled, which is a determination for the Commissioner of Social Security per Social Security Ruling 96-5p (Exhibits 11F, pp. 36-39). The claimant saw Dr. Weinstein as part of his workers compensation claim, therefore, there is no indication Dr. Weinstein was

familiar with Social Security law or that he applied the Social Security Regulations when offering his opinions and assessment. Moreover, the undersigned is not required to rely upon or adopt the findings of another agency. Dr. Weinstein also offered an opinion on November 18, 2013 – which I give no weight because he provided little to no support for his conclusion that the claimant was markedly limited. He used checkmarks in what appears to be more of an attempt to help the claimant retain workers' compensation benefits rather than a [sic] objective assessment of his ability to work at any job, which is the standard for Social Security purposes. He did not provide sufficient information in his treatment notes to support his assessments either.

(Tr. 92)

Regarding the opinions of the other physicians mentioned in Logan's brief, the ALJ

stated:

No weight is given to the opinions of Dr. Foerstner dated July 2, 2013, Dr. Chatterjee dated October 30, 2013 and March 2, 2015 and Deborah Koricke, Ph.D., dated April 17, 2014 as their examinations of the claimant all occurred two or more years after the claimant's disability insured status expired (Exhibits 6F, p. 4; 11F, pp. 28-31; 17F; 18F). Moreover, their statements the claimant is disabled and cannot work are legal opinions reserved to the Commissioner and not medical opinions.

(Tr. 92)

The Commissioner correctly states that no treating physicians offered opinions addressing Logan's mental or physical impairments during the relevant period. Dr. Weinstein met with Logan once during this period and provided a psychological evaluation report. (Tr. 580-583) The regulations recognize that the nature and extent of a treating relationship is relevant to the weight given to physician's opinion. See 20 C.F.R. §§ 404.1527(c)(2)(i), 416.927(c)(2)(i). A treating source is one who sees a claimant with a frequency consistent with accepted medical practice for the claimant's medical condition. 20 C.F.R. §§ 404.1502, 416.902. Logan states that he had a treatment relationship with Dr. Weinstein dating back to 2010. He cites transcript pages 601-651 in support of this statement. ECF Doc. 12 at Page ID# 971. However, these pages contain treatment notes from Dr. Cassady; they are not from Dr. Weinstein. Logan testified that he met with Dr. Weinstein on a weekly basis, but there is no

evidence of this alleged treatment in the record. The record evidences only one meeting between Dr. Weinstein and Logan during the relevant period. (Tr. 580-583) Logan has failed to cite any case law or other support for his argument that Dr. Weinstein was his treating physician.

Logan contends that the ALJ provided no reasoning at all for rejecting the opinion of Dr. Weinstein. But this is not true. The ALJ assigned little weight to his opinion because Dr. Weinstein completed his evaluation for a different agency, because he relied heavily on Logan's self report, and because the determination of total disability is reserved for the Commissioner. She also noted that Dr. Weinstein's November 18, 2013 report, which was completed long after Logan's last insured date, used checkmarks and was not supported by sufficient information in his treatment notes. (Tr. 92) Logan argues that the ALJ's reasoning defies logic because she criticized Weinstein's use of checkmarks and that he worked for a different agency. However, courts have increasingly questioned the evidentiary value of "multiple choice" opinion forms not supported by clinical records. *Petero v. Colvin*, No. 16-11389, 2017 U.S. Dist. LEXIS 144041 at *19-20 (E.D. Mich. August 14, 2017). And, regardless of the agency to which his opinion was submitted, the ALJ was not required to assign controlling weight to Dr. Weinstein because he was not a treating physician. The ALJ was not even required to provide good reasons for rejecting the opinion of Dr. Weinstein. Nevertheless, the ALJ explained why she did not assign controlling weight to his opinion. The ALJ did not err in determining that Dr. Weinstein's evaluation report was not entitled to controlling weight. *Atterberry v. Sec'y of Health & Human Servs.,* 871 F.2d 567, 572 (6th Cir. 1989); *Rudd v. Comm'r,* 531 Fed. App'x 719, 729 (6th Cir. 2013).

Logan met the insured status requirements through December 31, 2011. (Tr. 87) Dr. Weinstein's November 2013 opinion and the opinions of Dr. Foerstner, Dr. Chatterjee, and Dr. Koricke were all formed after the relevant time period. An ALJ may properly disregard

treatment records and opinions that are not relevant to whether plaintiff was disabled prior to the date last insured. *Adams v. Comm'r of Soc. Sec.,* No. 4:13-cv-22-HSM-SKL, 2014 U.S. Dist. LEXIS 93258 at *39-*40 (E. Dist. Tenn. June 3, 2014), citing *Strong v. Soc. Sec. Admin.*, 88 F. App'x 841, 845 (6th Cir. 2004) ("Evidence of disability obtained after the expiration of insured status is generally of little probative value.") "Medical evidence dated after a claimant's expiration of insured status is only relevant to a disability determination [when] the evidence 'relates back' to the claimant's limitations prior to the date last insured." *Id.*; *see also Wirth v. Comm'r of Soc. Sec.,* 87 F. App'x 478, 480 (6th Cir. 2003) ("Post-expiration evidence must relate back to the claimant's condition prior to the expiration of her date last insured."). "The related back evidence is relevant only if it is reflective of a claimant's limitations prior to the date last insured, rather than merely his impairments or condition prior to this date." *May v. Astrue,* No. 4:10CV1533, 2011 U.S. Dist. LEXIS 88551, 2011 WL 3490186, at *5 (N.D. Ohio June 1, 2011). Here, Logan argues that the ALJ improperly discounted several opinions which post-dated his date last insured. However, he does not attempt to argue that any of these opinions were formed during or related back to the relevant time period. He simply ignores this fact. Unfortunately for Logan, the opinions he relies on have very little probative value in this case and the ALJ properly rejected them.

Logan's brief also refers to an "opinion" from Dr. Shall. ECF Doc. 12 at Page ID# 972. However, this record (Tr. 466) is a treatment note from an appointment ten days after Logan underwent surgery. It stated that Dr. Shall discussed restrictions with Logan, but it did not state that he could not work. The ALJ was not required to give controlling weight to this treatment note from Dr. Shall.

Logan complains that the ALJ assigned little weight to the mental capacity assessments by state agency reviewers, Dr. Tangeman and Dr. Voyten. But these reviewing psychologists

determined that there was insufficient evidence in the record to determine whether Logan had a mental disorder before the date last insured. (Tr. 157, 170) The ALJ determined that the lack of evidence showed that Logan's mental condition was not sufficiently severe to seek treatment or to impact his work. (Tr. 91) Even if it was error for the ALJ to find that Logan's depression was non-severe, she evaluated his depression in her decision. The state agency reviewing psychologists did not find any limitations caused by Logan's mental impairment. Moreover, Logan does not explain how assigning little weight to the opinions of the state agency reviewing psychologists – who had no opinions supportive of Logan's disability claim – had any impact on his claim.

Logan's arguments regarding the treating physicians' opinions in this case are vague. He fails to state specific reasons why these "opinions" were entitled to greater or controlling weight. The court declines to formulate arguments on Logan's behalf, and the issues he has identified in only a perfunctory manner are deemed waived. *See Hollon v. Comm'r of Soc. Sec.,* 447 F.3d 477, 491 (6th Cir. 2006); *Moore v. Comm'r of Soc. Sec.,* 573 F. App'x 540, 543 (6th Cir. 2014).

As indicated above, there is a "zone of choice," within which the ALJ may decide a case without interference from the courts. *McClanahan,* 474 F.3d at 833. The ALJ did not err in assigning less than controlling weight to the opinion of Dr. Weinstein or to the opinions post-dating Logan's last insured date. To the contrary, it would have been error to assign controlling weight to these opinions. And because Dr. Weinstein was not a treating source, the ALJ was not required to provide good reasons for the weight assigned to his opinions. Thus, the ALJ adequately supported her decision to assign less than controlling weight to the opinion of Dr. Weinstein and to the other medical opinions in the record.

### C.    Depression – Non-Severe Finding

Logan contends the ALJ erred in finding his depression was not a severe impairment. ECF Doc. 12 at Page ID# 975.  Logan cites the ALJ's discussion of the four broad functional areas at Step Two of the sequential analysis.  He argues that, because the ALJ found that he had a mild limitation in two of the functional areas, she should have found that his depression was severe.  He contends that "mild" is "more than minimal," but he cites no case law or other authority to support this argument.  *Id.*

The Commissioner contends that Logan's argument lacks merit because the ALJ properly designated Logan's depression as non-severe based on mild findings at Step Two.  *See* 20 C.F.R. § 404.1520a(d)(1) ("If we rate the degrees of your limitation as "none" or "mild," we will generally conclude that your impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities.")  The Commissioner cites case law supporting the ALJ's non-severe finding.  *Atterberry,* 871 F.2d at 572 (Record as a whole and a finding that claimant was "somewhat or mildly depressed" showed that claimant did not have a severe mental impairment.); *Carrelli v. Comm'r of Soc. Sec.,* 390 F. App'x 429, 435-436 (6th Cir. 2010) (non-severe mental impairment despite moderate limitations.)  The Commissioner also notes that Logan did not challenge the ALJ's specific factual findings underlying the mild findings or non-severe assessment at Step Two.  ECF Doc. 13 at Page ID# 1000.

The Commissioner has the better argument here.  The regulations provide that findings of no limitations or only mild limitations generally result in non-severe findings.  20 C.F.R. § 404.1520a(d)(1).  Conversely, Logan has failed to cite any authority requiring the ALJ to find that his depression was severe based on her mild findings in the functional areas.

Logan also states that six different medical professionals determined that his depression was severe. He does not name the professionals or cite their opinions. However, based on his earlier arguments, he is likely referring to the opinions of Dr. Weinstein, Dr. Foerstner, Dr. Chatterjee, Dr. Koricke, Dr. Tangeman, and Dr. Voyten. As already explained, the ALJ properly rejected the opinions of Dr. Weinstein, Dr. Foerstner, Dr. Chatterjee, and Dr. Koricke. And Logan mischaracterizes the opinions of Dr. Tangeman and Dr. Voyten. These reviewing psychologists determined that there was insufficient evidence to determine whether Logan had a disability before the date last insured. (Tr. 157)

The ALJ correctly noted that there was a "paucity of evidence containing complaints or treatment" related to Logan's mental impairments. She determined that his condition was not sufficiently severe for him to seek treatment or to impact his work before the last insured date. (Tr. 91) Logan hasn't pointed to evidence in the record showing that this condition was severe during the relevant time period. Nor has he cited any evidence showing that his mental impairment caused functional limitations during the relevant time period. The ALJ did not err in finding that Logan's depression was non-severe during the relevant time period.

Moreover, even if it was error for the ALJ to conclude Logan's depression was non-severe, the error was harmless. The Sixth Circuit has construed the Step Two severity regulation as a "*de minimis* hurdle" in the disability determination process. *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir.1988). Under a Social Security policy ruling, if an impairment has "more than a minimal effect" on the claimant's ability to do basic work activities, the ALJ is required to treat it as "severe." SSR 96-3p, 1996 SSR LEXIS 10 (July 2, 1996). However, once an ALJ determines that one or more of the claimant's impairments to be severe, she must consider all the claimant's severe and non-severe impairments in the remaining steps of the sequential analysis. As argued by the Commissioner, the finding that Logan's depression was non-severe at Step Two is legally

irrelevant if the ALJ considered it in the remaining steps of the sequential analysis.  *See Anthony v. Astrue,* 266 Fed. App'x 451, 457 (6th Cir. Ohio 2008), citing *Mariarz v. Sec'y of Health & Human Servs.,* 837 F.2d 240, 244 (6th Cir. 1987) (holding that the failure to find that an impairment was severe was harmless error when other impairments were deemed severe).  In cases such as this, courts look to see whether the ALJ actually considered the impairments deemed non-severe at later steps in the sequential analysis.  *See Simpson v. Comm'r of Soc. Sec.,* 344 Fed. App'x 181, 191, 2009 U.S. App. LEXIS 19206 (6th Cir. 2009); *White v. Comm'r of Soc. Sec.,* 312 F. App'x 779, 787 (6th Cir. 2009).

Here, the ALJ determined that Logan had severe impairments related to his back condition.  (Tr. 87)  She then considered Logan's depression at later steps in the sequential analysis.  (Tr. 91)  Thus, even if she erred in finding that Logan's depression was non-severe during the relevant time period, her error was harmless.

## VI.    Conclusion

The ALJ properly handled the evidence of Logan's medical sources and properly concluded that Logan's depression was not severe during the relevant time period.  Because the ALJ's decision was supported by substantial evidence and because Logan has not identified any incorrect application of legal standards, the final decision of the Commissioner is AFFIRMED.

IT IS SO ORDERED.

Dated: June 28, 2018

Thomas M. Parker
United States Magistrate Judge